UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN KEEFER, | CASE NO. 5:10CV1485 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Kathleen Keefer ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1.  For the following reasons, the Court AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint with prejudice:

**I**.  **PROCEDURAL AND FACTUAL HISTORY**

On April 29, 2005, Plaintiff applied for DIB, alleging disability beginning March 16, 2002. Tr. at 76-78.  The SSA denied Plaintiff's application initially and on reconsideration.  Tr. at 19-20. On November 14, 2005, Plaintiff filed a request for an administrative hearing.  Tr. at 40.  On June 25, 2008, an ALJ conducted an administrative hearing *via* video conference where Plaintiff was represented by counsel.  Tr. at 901-934. At the hearing, the ALJ accepted the testimony of Plaintiff and Thomas F. Nimberger, a vocational expert ("VE").   On August 22, 2008, the ALJ issued a Decision ("Decision") denying benefits.  Tr. at 10-18.  Plaintiff filed a request for review, Tr. at 9, which the Appeals Council denied.  Tr. at 5.

On July 6, 2010, Plaintiff filed the instant suit seeking review of the Decision.  ECF Dkt. #1. On November 1, 2010, Plaintiff filed a brief on the merits.  ECF Dkt. #14. With leave of Court on January 19, 2011, Defendant filed a brief on the merits.  ECF Dkt. #18.  Plaintiff's reply brief was filed on February 1, 2011.  ECF Dkt. #19.

**II**.   **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from cervical disc disease, right leg deep vein thrombosis ("DVT"), and tremors which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 14. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404.1520(d), 4041525 and 404.1526. He ultimately concluded that Plaintiff has the residual functional capacity ("RFC") to perform medium work, except she could do no climbing of ladders, ropes and scaffolds, and only occasional climbing of stairs or ramps, balancing, stooping, crawling, crouching or kneeling; and no more than occasional fingering. Tr. at 14-15. As a consequence, the ALJ concluded that Plaintiff was able to perform her past relevant work as a fragrance promoter, which was exertionally light and semi-skilled; a personnel clerk, which was exertionally sedentary and semi-skilled; and an outside sales representative, which was exertionally light and semi-skilled. Tr. at 17.

**III.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§

404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, __ F.3d __, 2011WL 2745792, *3, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

### V. ANALYSIS

Plaintiff contends that the ALJ did not give appropriate weight to the opinion of the treating physician, Eugene Pogorelec, D.O, in this case. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v.*

*Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004.). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir.2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

However, "[w]hen a treating physician . . . submits an opinion on an issue reserved to the Commissioner-such as whether the claimant is 'disabled' or 'unable to work'- the opinion is not entitled to any particular weight." *Turner v. Commissioner of Social Security*, No. 09-5543, 2010 WL 2294531 at *4, (6th Cir. June 7, 2010), unreported; *see also* 20C.F.R. §416.927(e)(1). "Although the ALJ may not entirely ignore such an opinion, his decision need only explain the consideration given to the treating source's opinion." *Id*. (internal quotation and citation omitted). In *Turner*, a treating source opined that the claimant was unable to work" and was not "currently capable of a full-time 8-hour workload." *Id*. at *5. The Sixth Circuit held that the ALJ adequately addressed the opinion in stating that it was an opinion on an issue reserved to the Commissioner. *Id*.

Plaintiff was 49 years old on the date that the Decision was issued.  Her injuries stem from an automobile accident that occurred on May 25, 2001.  Tr. at 572.  She continued working after the accident until she underwent a post-cervical laminectomy in March 2002.  Tr. at 427, 910.  At the hearing, Plaintiff complained of decreased strength, Tr. at 912-913, tremors, which made it difficult to hold objects, Tr. at 913, chronic pain, Tr. at 914, and difficulty sleeping.  Tr. at 915.  She claimed that she could only stand for an hour to an hour and a half and lift five to eight pounds.  Tr. at 918-19.  She cannot cook or do any housekeeping, she has difficulty caring for herself, but she is able to attend church and her son's wrestling matches.  Tr. at 923-26.

Two physical residual functional capacity assessments ("PRFCAs") were completed during the course of Plaintiff's treatment following her surgery.  According to the PRFCA completed by Paul Morton, M.D. of DDS on June 24, 2005, Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently.  Tr. at 662.  Plaintiff could stand and/or walk for about six hours in an eight hour workday and also stand for about six hours in an eight hour workday.  Plaintiff had an unlimited ability to push and/or pull, other than as shown for lift and/or carry.  Plaintiff  could frequently climb ladder, rope, or scaffold, but did not mark anything next to the examples of postural limitations including the ability to climb ramps or stairs, balance, stoop, kneel, crouch, or crawl.  Tr. at 663. Plaintiff had no manipulative, visual, communicative, or environmental limitations. Id. at

664-668. On September 19, 2005, Teresita Cruz, M.D. of DDS reviewed the evidence in the file and affirmed Dr. Morton's conclusions. Tr. at 668.

According to the PRFCA completed by Dr. Pogorelec on June 22, 2006, Plaintiff's treating physician, Plaintiff suffered from right C6 radiculopathy; HNP, fusion; chronic myofascial pain syndrome; advanced OA of knees; and tremor of the right hand. Plaintiff can walk one to two city blocks, sit 30 minutes, stand 45 minutes, and combine sitting, standing, and walking for about two hours in an eight hour day. Plaintiff needs to lie down and rest at unpredictable intervals daily and needs to rest about two hours before returning to work. Tr. at 670. Plaintiff can frequently lift/carry less than ten pounds and occasionally lift/carry ten pounds. She can stoop for ten percent of an eight hour day and crouch for five percent of an eight hour day. Plaintiff has good and bad days. Her other limitations include the inability to stand for any length of time, weakness in her right arm, and pain in her hands and knees. Dr. Pogorelec opined that Plaintiff became disabled on May 25, 2001. Tr. at 671.

> The ALJ made the following findings regarding the opinion evidence:
>
> [R]eviewing DDS physicians concluded on June 24, 2005 that claimant's impairments did not meet or equal any Listing and that she had residual functional capacity that allowed for medium work (i.e. lifting up to 50 pounds occasionally and 25 pounds frequently, standing and/or walking and/or sitting for a total of six hours in a normal 8-hour workday) allowing periodic alternating between sitting and standing and subject to <u>postural</u> limitations against climbing ladders, ropes, and scaffolds; or more than occasional kneeling, stooping, crouching, crawling, or climbing of ramps and stairs more than frequently (Exhibit 21F). On June 23, 2005, the DDS reviewers found that there was insufficient evidence to establish a mental disorder of any kind prior to the date of last insured of March 31, 2003 (Exhibit 20F). This expert evidence under SSR 96-6p is adopted as to claimant's condition since it is consistent with the medical and other evidence, including recent treatment records and the testimony.
>
> Two exhibits were received at the hearing (Exhibits 22F and 23F) that were not available for consideration by the DDS reviewers. Exhibit 22F is a Residual Functional Capacity Report completed by claimant's physician, Dr.Pogorelec, which asserts that claimant has been disabled since May 25, 2001. However, that opinion is not consistent will his own treatment records. Those records (Exhibit 23F) from Dr. Pogorelec address claimant's knee problem, which developed after the DLI, but also document that the cervical radiculopathy has resolved as noted above. The assessment is given no weight.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 416.929. In order for pain or other subjective complaints to be considered disabling, there

-6-

must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms.  *See id.*  Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  *See id.*

Here, the AJL found that underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms, however, his did not credit Plaintiff's claims about the degree of her limitations.  The ALJ notes that neither Dr. Pogorelec's RFCA nor his treating notes from May 5, 2003 to April 15 2008 were available to the DDS reviewing physicians.  However, after reviewing Dr. Pogorelec's notes, the ALJ concluded that his RFCA is not well-supported by his treatment notes.

After reviewing the medical records of Dr. Pogorelec, the undersigned agrees that his PRFCA is not well-supported by the medical evidence in this case.  Four weeks after Plaintiff's cervical spine fusion surgery, Jeffrey M. Cochran, DO, the physician who performed Plaintiff's surgery, noted that her "right upper extremity symptoms have resolved," and that her most significant complaint is that of the left upper extremity where she developed a phlebitis status post IV access. Tr. at 256.  He recommended an increase in Plaintiff's level of activity and scheduled physical therapy to restore motion and strength in the upper and lower extremities.  *Id.*  Twelve weeks post surgery, Dr. Cochran's notes indicate that Plaintiff was dressed for the pool and on her way to a family outing. Tr. at 251.  An x-ray showed satisfactory fusion from the surgery, and examination revealed full upper extremity strength with breakaway right upper extremity strength.

Plaintiff had good dexterity and walked without difficulty. Dr. Cochran encouraged Plaintiff to resume physical therapy and begin a walking program.

In November 2002, Plaintiff was referred to Domingo Gonzalez, MD, a neurologist, to determine an explanation for sensory changes to the left side of her body. Dr. Gonzalez noted that Plaintiff's thyroid function test and brain MRI were normal. Tr. at 464. Examination revealed normal cervical spine range of motion and Plaintiff walked normally. Tr. at 466. Dr. Gonzalez noted some changes between C5 and C6, that may explain in part her pain, but he saw no problem with C6-C7, which Dr. Cochran repaired. He recommended that Plaintiff see another neurologist to determine the source of her tremors.

The following month, Plaintiff saw Michael J. Leslie, M.D. Tr. at 462. Dr. Leslie stated that he did not have a firm neurologic diagnosis for Plaintiff's tremors in light of the normal radiographic and laboratory evaluations to date. Tr. at 463. Dr. Leslie expressed concern that Plaintiff may have psychiatric issues, but Plaintiff chose to defer on a formal psychiatric consultation at that time.

In January 2003, Plaintiff began seeing David P. Gutlove, MD for pain management. Tr. at 888. Dr. Gutlove diagnosed post cervical laminectomy fusion syndrome, cervical pain, cervical radiculitis, myofascial pain syndrome, insomnia and reactive depression. In his correspondence to Dr. Pogorelec dated March 4, 2003, Dr. Gutlove observed that "this is a quite difficult case from a pain management standpoint" noting that Plaintiff exhibited severe pain, but that he did not believe that steroid injections would provide her any benefit. Tr. at 889. Plaintiff had previously discontinued physical therapy and occupational therapy because they were not providing any relief. She had previously discontinued Nuerontin due to nausea. Dr. Gutlove admitted that he was "at a loss as to what else to try" and recommended treatment by a psychologist. In April 2003, Plaintiff began seeing Denis Ward, Ph.D. He diagnosed depression resulting from frustration with her attempts to return to normal functioning. Tr. at 881. At the hearing, Plaintiff testified that she saw Dr. Ward "just kind of short time" to deal with aggravation and strong emotions after her surgery. Tr. at 921.

Plaintiff's pain and tremors continued in 2003. Plaintiff returned to Dr. Gonzalez, who recommended an electromyogram and a nerve conduction study to compare with tests done in

-8-

February, in order to determine if there was any radicular component to Plaintiff's pain.  Tr. at 871-72.  According to Dr. Gonzalez's correspondence to Dr. Gutlove dated August 23, 2003, the CT myelogram showed some minimal defect between C5-C6 with very little foraminal compromise, "which cannot explain her complaints mainly on the right upper extremity, with pain and numbness in the thumb, index and middle fingers."  Tr. at 871.  The results of the electromyogram and the nerve conduction study were normal.  Based upon the tests, Dr. Gonzalez suspected that Plaintiff may have cervical spondylosis, mainly at C5-C6, and recommended that she see another neurologist.  Tr. at 865.

John C. Andrefsky, M.D., a neurologist, examined Plaintiff in September 2003.  He concluded that Plaintiff's tremor was not the product of a neurodegenerative disease, but instead, caused by "an extreme amount of anxiety."  Tr. at 861.  Correspondence from Dr. Gutlove dated October 3, 2003 indicates that Plaintiff, who had resumed physical therapy at some point, decided to stop at that time because it was not providing any benefit.  Tr. at 858.  Another electromyogram and nerve conduction study was performed on December 16, 2003 to determine the source of Plaintiff's hemibody numbness, right arm pain and tremor.  The electromyogram was entirely normal, without any evidence of neuropathy, myopathy or radiculopathy.  Tr. at 854.

Dr. Pogorelec's medical notes reveal that throughout 2004 and 2005, Plaintiff suffered from recurrent gastrointestinal problems.  She returned to Dr. Gutlove in December 2006 to address her chronic pain.  According to his correspondence to Dr. Pogorelec, Plaintiff's lumbosacral MRI was normal, but Dr. Gutlove planned to do additional testing to rule out S1 radiculopathy and stenosis not seen on the MRI.  Tr. at 783.  The additional testing did not reveal any abnormal results.  Tr. at 776.

Plaintiff resumed physical therapy in January 2007.  Tr. at 770.  At that time she reported constant pain at a level between nine and ten.  The notes from the physical therapist indicate that Plaintiff was very emotional about her lack of progress. In June of 2007, Plaintiff reported to Dr. Gutlove that she had been eating well and working out, and that she was feeling the best that she had felt in years.  Tr. at 751.

During the time that Dr. Pogorelec treated Plaintiff, he submitted two statements of continuing disability. In both documents, Dr. Pogorelec noted Plaintiff's difficulty functioning on a daily basis and his belief that she would not be able to return to work due to her chronic pain, inability to stand or sit for any period of time and the loss of strength in her arms and hands. Tr. at 734 (October 31, 2007), 842 (May 3, 2004).

On January 11, 2007, a lumbar myelogram was performed. Images obtained demonstrate a normal plain myelographic appearance without evidence of nerve root cutoff or impression upon the thecal sack. There was no evidence of disc bulge, disk herniation, or foraminal encroachment. The S1 nerve roots are seen to fill in a normal fashion without nerve root contact from the LS-S1 disc space. The neural foramina were patent at each level. The lumbar vertebral bodies are normal in height and alignment. Portions of the spinal cord and conus medullaris that appeared in the MRI were unremarkable. Tr. at 687.

Although Dr. Pogorelec's medical records reflect Plaintiff's continuing complaints about pain and tremors, his conclusion that Plaintiff's impairments rendered her unable to work are not "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

## VI. CONCLUSION

For the foregoing reasons, the undersigned AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint with prejudice.

DATE: October 3, 2011

                                        */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE